UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------x
EUNICE MARTINEZ,

          Plaintiff,

  -against-                      **MEMORANDUM AND ORDER**
                                        No. 14-CV-3741 (FB) (JO)
DAVIS POLK & WARDWELL LLP,

          Defendant.
-------------------------------------------------x

*Appearances:*
*For the Plaintiff:*                           *For the Respondents:*
ROOSEVELT SEYMOUR, ESQ.        BARRY ASEN, ESQ.
162 Montague Street, Suite 201        LAUREN MALANGA, ESQ.
Brooklyn, New York 11201             Epstein Becker & Green, P.C.
                                                250 Park Avenue
                                                New York, New York 10177-1211

**BLOCK, Senior District Judge:**

      Eunice Martinez sues her employer, Davis Polk & Wardwell LLP ("Davis Polk"), for discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981 and the New York State Human Rights Law. Davis Polk moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted.

I

      Martinez is a Hispanic woman with a bachelor's degree in film studies from Columbia University. In 1995, she was hired as a legal secretary by Davis Polk.

Approximately one year later, she was promoted to managing editor of Davis Polk's new Business Development Department ("BDD"). Her duties included proofreading and editing various marketing materials produced by the firm. Her annual salary was $39,000  The position was classified as non-managerial and non-exempt, which allowed Martinez to earn overtime pay.

The head of the BDD was initially a white woman. In 2001, Kevin Cavanaugh, a white man, was hired as the new head of the BDD.

The BDD grew over time. Between 1998 and 2009, the firm hired six white women, two Hispanic women and one white man to fill various non-managerial positions in the department, as well as two managerial positions. In 2010, it hired Larissa Palmer, a white woman, to be BDD's assistant director under Cavanaugh.

During the same time frame, Martinez's responsibilities increased. The firm transferred management of its public website to BDD in 2009, and Cavanaugh assigned Martinez the tasks of editing and posting website content, as well as handling technical issues with the website's content-management software. In 2010, Martinez asked both Cavanaugh and Palmer to upgrade her job to a managerial position with a dedicated administrative assistant. On both occasions, she was told that budgetary constraints precluded her requests. Martinez's base salary at this time was $85,600. She continued to receive favorable performance evaluations and annual raises.

Meanwhile, the BDD continued to expand, hiring three white women and two

white men to fill new managerial and non-managerial positions. In addition, several existing staff members other than Martinez were upgraded to manager-level positions, and some were assigned administrative assistants. These upgrades came with higher salaries ranging from $110,000 to $216,000. Martinez's base salary in 2014 was $98,000, but she also earned an additional $23,154 in overtime pay, for a total of $121,154.

One of the new managers was Svetlana Teplitsky, who was hired for an unspecified non-managerial position in 2007 and promoted to Digital Group Marketing Manager in 2012. As such, Teplitsky became Martinez's direct supervisor. Martinez describes Teplitsky as "aggressive, abrasive, and difficult to get along with." Pl.'s Mem. of Law 8. At some point during 2012, Martinez repeated her requests for a title upgrade and administrative assistant to Teplitsky. It is undisputed that Teplitsky did not have the authority to grant the requests, but she told Martinez that she would not recommend them. Martinez complained to the firm's human resources manager about Teplitsky's management style in late 2012 and again in early 2013.

In August 2013, Martinez filed a charge of race discrimination with the EEOC. At the time she filed the charge, she was aware that Teplitsky had raised specific concerns about her performance. She expected that Teplitsky would give her an unfavorable performance review and recommend her termination.

Martinez received the evaluation in September 2013. Teplitsky identified

3

deficiencies in three areas—time management, adjustment to change, and attention to detail—but did not recommend termination. Instead, Martinez received a $1,500 raise, bringing her base salary to the aforementioned $98,000 per year.

The EEOC issued a right-to-sue letter on March 19, 2014. This action followed.

## II

Martinez raises three claims. First, she argues that was not upgraded or promoted because she is Hispanic. Second, she argues that her annual raises were lower than those of her white co-workers. Third, she argues that she received a lower-than-usual raise in 2014 in retaliation for filing a charge with the EEOC.

All three claims are subject to the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998) (failure to promote); *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999) (discriminatory compensation); *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (retaliation). First, Martinez must offer sufficient evidence to support a prima facie case. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). If she succeeds, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason for its action.'" *Id.* (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). At that point, Martinez "may no longer rely on the presumption raised by the prima facie case, but may still prevail by

4

showing, without the benefit of the presumption, that the employer's determination was in fact the result of" discrimination or retaliation. *Id.*

The elements of the prima facie case vary for each of Martinez's claims. Therefore, the Court addresses each claim in turn.

**A. Failure to Promote/Upgrade**

Martinez uses the terms "promotion" and "upgrade" interchangeably. They are, in fact, different things. A promotion involves a "qualitatively different relation between the employer and employee." *Butts v. New York Dep't of Housing Pres. & Dev.*, 990 F.2d 1397, 1412 (2d Cir. 1993), *superseded on other grounds by* 42 U.S.C. § 1981(b). "The elevation from associate to partner [in a law firm] is perhaps the paradigm of a new and distinct relation," *id.* at 1411; other examples include "a move from factory worker to foreman, foreman to foreman supervisor, or manager to officer." *Id.* at 1412. Job titles are relevant, but the inquiry also includes "actual changes in responsibilities and status." *Id.*

This concept of a promotion as a move from one distinct position to another is reflected in the prima facie case for a failure-to-promote claim, which requires the plaintiff to demonstrate that "1) he is a member of a protected class; 2) he applied for promotion to a position for which he was qualified; 3) he was rejected for the position; and 4) the employer kept the position open and continued to seek applicants." *Mauro v. Southern New England Telecomm., Inc.*, 208 F.3d 384, 386 (2d Cir. 2000) (citing

5

*Brown*, 163 F.3d at 709). Three of those four elements contemplate the existence of a position that the plaintiff does not currently hold.

In the main, Martinez's claim is not that she was denied a promotion to a different position, but that her existing job was not upgraded to a mangerial-level position. She concedes that she was not qualified for all but one of the new managerial positions created in the BDD, and stated at her deposition the she "sought a promotion or an upgrade to a manager *in her area of responsibility*." Pl.'s Mem. of Law 26 (citing Martinez Dep. 158-59). She does claim, however, that she was qualified for and interested in the Digital Group Marketing Manager position that ultimately went to Teplitsky.

In sum, Martinez's first claim is actually two separate claims based on (1) Davis Polk's decision to give the Digital Group Marketing Manager position to Teplitsky instead of her, and (2) its decision not to upgrade Martinez's existing position to a managerial one. The Court must analyze those claims separately.

### *1. Failure to Promote*

Davis Polk argues that Martinez cannot satisfy the second and fourth elements of the prima facie case set out above. With respect to the second, it argues that Martinez did not apply for the position. But this aspect of the prima facie case is "subject to modification where the facts of a particular case make an allegation of a specific application a quixotic requirement." *Brown*, 163 F.3d at 710. In particular,

6

the application requirement is excused if "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir. 2004).

It is apparently undisputed that the Digital Group Marketing Manager was created specifically for Teplitsky. There is, at least, no evidence that the position was posted or open to other applicants. *Cf. Brown*, 163 F.3d at 710 ("Brown does not charge, for example, that Coach refused to accept applications for positions or hand-picked individuals for promotion to a position without considering applicants.").

Davis Polk further argues that Martinez was not qualified for the position. It cites to a written job description requiring experience with social media, search-engine optimization and email marketing, and a bachelor's degree in "Computer Science, Marketing, Web/Graphic Design or related studies" Decl. of Elizabeth Farah, Ex. I. As Martinez points out, however, this job description was used to hire Teplitsky's replacement when she left the firm in 2014. The record does not contain a written job description in effect when Teplitsky was hired in 2012.

Although Martinez's qualifications are not relevant to the second element, her qualifications relative to Teplitsky are relevant to the fourth. The usual formulation of the fourth element—that "the employer kept the position open and continued to seek applicants," *Mauro*, 208 F.3d at 386—obviously does not apply when the

7

position has been filled. In such cases, the Second Circuit applies the more generic formulation—whether "the circumstances of the [failure to promote] give rise to an inference of discrimination." *Mandell v. County of Suffolk*, 316 F.3d 368, 377 (2d Cir. 2003). That question, in turn, requires the plaintiff to "show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham v. Long Is. R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (internal quotation marks omitted). In the context of a promotion, that means comparing the qualifications of the plaintiff with those of the person promoted. *See Mandell*, 316 F.3d at 379 ("[P]laintiff has adduced enough evidence to support a finding that the promoted officers and plaintiff were sufficiently similarly situated to support an inference of discrimination."); *Terry v. Ashcroft*, 336 F.3d 128, 139 (2003) ("[T]he circumstances under which [the plaintiff] was not selected give rise to an inference of discrimination on the basis of race because his application is marked with his race and the position was offered to an allegedly significantly less qualified African–American man.").[1]

---

[1] By contrast, for claims of discriminatory *termination*, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis." *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). In such cases, relative qualifications may become relevant at a later stage of the *McDonnell Douglas* analysis if the employer offers the replacement's superior qualifications as a non-discriminatory reason for the termination. *See, e.g., Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) ("[T]he plaintiff's credentials would have to be so superior to the credentials of the

8

The Court concludes that Teplitsky's qualifications do not raise an inference of discrimination. Teplisky has a bachelor's degree in computer systems and a master's degree in marketing; Martinez has a bachelor's degree in film studies. Martinez conceded at her deposition that Teplitsky was "tech savvy," Martinez Dep. 166, and that she did not have the same level of experience as Teplitsky with computers, certain programs, social media and email marketing.

The point, of course, is not to conduct a de novo review of Teplitsky's and Martinez's qualifications, nor to second guess Davis Polk's assessment. *Cf. Byrnie*, 243 F.3d at 103 ("Our role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments." (citation omitted)). The question is whether selection of a particular candidate for a position, standing alone and in light of his or her qualifications, justifies an inference that race was at least part of the reason for the selection. In this case, it does not.

Martinez bolsters her prima facie case with statistical evidence: none of the

---

person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." (internal quotation marks omitted)).

This different analytical framework is largely a matter of semantics in this case. Even if the Court were to conclude that giving the position of Digital Group Marketing Manager to a white employee was sufficient to make out a prima facie case, it would hold that there is insufficient evidence under *Byrnie* to rebut Davis Polk's reliance on Teplitsky's qualifications as a legitimate, nondiscriminatory reason for its decision.

9

three Hispanic employees in the BDD was promoted during their tenure. But Martinez's own expert could not attribute any statistical significance to that fact because of the small sample size involved.

In any event, Martinez's proferred statistical evidence offers no insight as to why *she* was not chosen as Digital Group Marketing Manager. "Statistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she *in particular* has been discriminated against." *Drake v. Delta Air Lines, Inc.*, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005) (citing *Hudson v. International Bus. Machs. Corp.*, 620 F.2d 351 (2d Cir.1980)), *aff'd*, 216 Fed. App'x 95 (2d Cir.2007). In this case, for example, the statistical evidence does not account for the interest of Martinez and her Hispanic co-workers in particular promotions, or for their qualifications.[2]

In sum, the Court concludes that Martinez has not offered sufficient evidence to justify an inference that Teplitsky's selection as Digital Group Marketing Manager was the result of discrimination.

## 2. *Failure to Upgrade*

Unlike a promotion—as that term is usually understood—an upgrade involves a change in the title, status, benefits and/or responsibilities of the plaintiff's existing

---

[2]In light of its assessment of the statistical evidence, the Court denies Davis Polk's motion to strike Martinez's statistical expert's report as moot.

position. Here, Martinez's argues that her position as Managing Editor should have been made a managerial-level position, which would have entailed a higher salary and possibly an administrative assistant, but would have also disqualified her from earning overtime.

As noted, the usual prima facie case for failure-to-promote claims is geared towards a move from one position to another. It is ill-suited to an upgrade of an existing position. Upgrade opportunities may not be posted, and are unlikely to be subject to an open application process. An employee is presumably qualified for his or her current job. And refusing an upgrade request will usually not result in a vacant position to be filled.

For these reasons, the Court concludes that the generic formulation of the prima facie case provides a more apt framework for analyzing Martinez's failure-to-upgrade claim. Thus, she must offer evidence that "1) [s]he belonged to a protected class; 2) [s]he was qualified for the position; 3) [s]he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry*, 336 F.3d at 138.

As with the failure-to-promote claim, the fourth element is dispositive. Again, Martinez must show that "she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39. While the comparison for the failure-to-promote claim was between Martinez's and

Teplitsky's qualifications, the apt comparison here concerns job duties.

Martinez identifies seven positions that were upgraded to managerial-level positions.[3] She concedes, however that the duties of the proposed comparators varied widely, that she could not perform some of those duties, and that her role in the department was "unique." Pl.'s Mem. of Law 16.

In addition, Martinez points out that her website-management duties were performed by a managerial-level employee before they were transferred to her in 2009. She does not dispute, however, that that employee had many other duties, and that she often delegated website management to non-managerial subordinates.

Martinez argues—correctly—that the comparisons need not be exact. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("A plaintiff is not obligated to show disparate treatment of an *identically* situated employee."). But the whole point of the fourth element of the prima facie case is to require the plaintiff to weed out enough of the myriad reasons for an employment decision to justify an inference that the reason was discrimination. The wide disparity of jobs Martinez offers for comparison suggests nothing more than that Davis Polk deemed certain roles in the BDD "managerial" in nature, but not Martinez's. That is a matter of

---

[3]The specific job titles are Public Relations Coordinator, Events Coordinator, Events Manager, three Business Development Analysts, and Teplinksy's untitled position before she was made Digital Marketing Group Manager.

business judgment, not unlawful discrimination.

## B. Raise Discrimination

"In order to make out a prima facie case of unequal pay for equal work under Title VII, a plaintiff must show that (1) she is a member of a protected class; and (2) she was paid less than non-members of her class for work requiring substantially the same responsibility." *Belfi*, 191 F.3d at 139. In addition to those requirements, which are generally the same as the requirements of the Equal Pay Act, "a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional . . . salary discrimination." *Id.* (citation and internal quotation marks omitted).

As with other discrimination claims, comparisons to the pay of other employees requires that the employees be similarly situated to the plaintiff. *See Russell v. County of Nassau*, 696 F. Supp. 2d 213, 233 (E.D.N.Y. 2010) (applying requirement to discriminatory compensation claim). In the context of pay disparities, sufficient similarity includes "holding positions of roughly the same rank." *Id.* (citing *McGuinness*, 263 F.3d at 54.

Once again, the requirement of sufficient similarity defeats Martinez's claim. She claims that she received annual raises of no more than 3% between 2009 and 2014. She then identifies six white members of the BDD who, in one or more of those years, received annual raises in excess of 3%. But those six were all managers. That

Davis Polk gave managers higher raises than non-managerial employees may (or may not) be a bad business practice, but it is not an indicium of discrimination. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*, for firing people on account of their age.").

**C. Retaliation**

To make out a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (citations and internal quotation marks omitted). The first three of those elements are not in dispute.

With respect to the fourth element, a close temporal proximity between protected activity and an adverse employment action will normally give rise to an inference of causation. *See Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("The three-week period from Kwan's complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."). But "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss*

14

*Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

At the time Martinez filed her charge with the EEOC, she expected that Teplitsky would give her an unfavorable performance review. That the review happened to take place after the charge was filed does not warrant an inference that the consequences of the review—a lower-than-usual raise—were caused by the filing of the charge.

### III

For the foregoing reasons, Davis Polk's motion for summary judgment is granted.

**SO ORDERED.**

/S/ Frederic Block  
FREDERIC BLOCK  
Senior United States District Judge

September 23, 2016  
Brooklyn, New York